**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| MARVIN EASTMAN, | Case No.: 2:07-cv-01658-RLH-RJJ |
| Plaintiff, | **O R D E R** |
| vs. | (Motion for Summary Judgment–#45; Motion for Hearing–#64) |
| CITY OF NORTH LAS VEGAS, and its POLICE DEPARTMENT, Political Subdivision of the STATE OF NEVADA; POLICE OFFICER DWAYNE MILLER, individually, and as a Police Officer employed by the NORTH LAS VEGAS POLICE DEPARTMENT; and CHIEF OF POLICE MARK PARESI, ASSISTANT CHIEF JOSEPH FORTI, CAPTAIN CHRISTOPHER LAROTUNDA, DEPUTY CHIEF EDWARD FINIZIE; and SERGEANT MICHAEL CARMODY, individually and as Police Officers employed by the NORTH LAS VEGAS POLICE DEPARTMENT; DOES I through X, inclusive, | |
| Defendants. | |

Before the Court is Defendants' **Motion for Summary Judgment** (#45), filed September 18, 2009. The Court has also considered Plaintiff Marvin Eastman's Opposition (#56), filed October 6, 2009, and Defendants' Reply (#63), filed October 19, 2009.

Also before the Court is Eastman's **Motion for Hearing** (#64), filed October 22, 2009.

1

AO 72
(Rev. 8/82)

**BACKGROUND**

On May 13, 2006, at approximately 4:00 pm, Defendant Officer Dwayne Miller heard an emergency broadcast come over the police dispatch indicating that a black male was choking a while female in a Cadillac in the parking lot of Mojave High School in North Las Vegas. At the time of this incident, Miller was training Officer Matthew Riedel. Because the officers were close to Mojave High School, they proceeded immediately to the school's parking lot. As the officers approached the parking lot a second broadcast came over the dispatch indicating that the male was now hitting the female.

Sitting in the passenger seat of the Cadillac was Plaintiff Marvin Eastman, who has served as a corrections officer at the North Las Vegas Detention Center for the last two years. His former girlfriend, Rebecca Gonzalez, was sitting in the driver's seat of the vehicle. Eastman and Gonzalez have a 13-year-old son old named Marvin Eastman III and they met in the school parking lot to exchange custody of him. At the time of this incident, Eastman III was sitting in the driver's seat of his father's car, which was parked immediately to the right of the Cadillac.

**I.      The Officers' Testimony**

The police officers involved in this incident give the following account of their confrontation with Eastman. Upon entering the parking lot, Riedel parked the patrol car approximately 20 feet behind the Cadillac. Miller exited the passenger side of the patrol vehicle, withdrew his handgun, and proceeded towards the Cadillac while Riedel verbally instructed the occupants of the car to "keep their hands in view." (Dkt. #45, Ex. 4.) According to the officers, neither passenger complied with this instruction, and Eastman turned to his right and said "I work for north town, and I can't believe you are doing this." (*Id.*) Miller alleges that because neither occupant of the car obeyed the command to keep their hands in view, he yelled at Eastman to put his hands out of the passenger side window, which (according to Miller) was open. Miller alleges Eastman initially complied with this request, but then pulled his hands back inside the car. Eastman then allegedly began yelling at Miller that "nothing was going on", "this is bullshit", and

2

1  "I haven't done anything." (*Id.*) Officer Miller further alleges he told Eastman several more times
2  to put his hands out the passenger window, but Eastman refused to comply.
3  At this point, Officer Smirga arrived on the scene. Smirga testifies that when he
4  arrived on the scene he saw Eastman's hands outside the window, but that Eastman then put them
5  back in the car. As Smirga moved towards the car, Eastman said "I am with north town and I can't
6  believe you are doing this." (*Id.*) Smirga subsequently made eye contact with Eastman and
7  ordered him to show his hands. Eastman allegedly refused to comply with this order and stated "I
8  can't believe you're doing this to me." (*Id.*) Eastman then began to open the car door and placed
9  his right foot on the ground. At this point, Smirga told Eastman to get out of the vehicle and
10 Miller ordered him to get on the ground. Eastman replied that he would not get on the ground
11 because the asphalt was too hot for his face. Miller then yelled "I'm not messing around with you,
12 get on the ground." (Dkt. #45, Ex. B.) Eastman finally lowered himself and pointed his face to the
13 ground, but he kept himself partially elevated using his hips and forearms. Unsatisfied with
14 Eastman's partial compliance, Miller ordered Eastman to lay flat so he could handcuff him, to
15 which Eastman again said it was too hot to put his face on the ground. After Eastman allegedly
16 refused one more time to put his face on the ground, Miller struck Eastman twice with his taser,
17 once in the lower back and once in the upper back. Smirga then handcuffed Eastman.

18 **II.     Eastman's Testimony**

19 Eastman's account of this incident differs in some ways from the account offered
20 by the police officers. While the officers allege Eastman and Gonzalez disobeyed the initial order
21 to keep their hands in the view, Eastman claims he could hear the officers saying something over
22 the loudspeaker, but did not know exactly what was said because the car was on, the engine and air
23 conditioning were running, and the windows were rolled up. Once Gonzalez turned the car off,
24 Eastman claims that he heard the officers order him to put his hands outside the window, but that
25 he could not comply with this order because the windows were rolled up. Eastman alleges that in
26 order to communicate with the officers he opened the door and told Miller "This is Eastman. My

AO 72
(Rev. 8/82)

1   P number is 1230. I'm an officer. I work for the same department that you do." (Dkt. #56, Ex.

2   A.) Miller then allegedly told Eastman to "close the fucking door." (*Id.*) Eastman alleges he

3   complied with this instruction but was then told by Officer Smirga to open the door and get out of

4   the car. Eastman then complied with Smirga's instruction, and when he stepped out of the car,

5   three guns were pointed at him. Eastman alleges he again told the officers he was a fellow North

6   Las Vegas Police Department officer, to which Miller allegedly responded "I don't give a fuck.

7   Get the fuck on the ground." (*Id.*)

8   Eastman claims he complied with this instruction and laid flat on the ground. A

9   short moment later, however, Miller allegedly ordered Eastman to put his face on the ground.

10  Eastman claims he could not comply with this requirement because the outside temperature was

11  close to 100 degrees and the asphalt was far too hot. Eastman further alleges that after initially

12  laying down on the asphalt, he had to prop himself onto his knees and elbows to relieve the

13  burning feeling in his torso. Eastman claims Miller responded to this by saying "I'm not playing

14  around. Put your face on the fucking ground." Eastman then responded "You're crazy. I'm not

15  putting my face on the goddamn ground." (*Id.*). At this point, Miller told Eastman "I'm going to

16  tase you" and he shot Eastman in the back. The voltage was delivered through two metal bars that

17  pierced Eastman's skin. Eastman alleges that after being tased in this manner, he rolled up into the

18  fetal position. Despite this, Miller applied a second taser shot, but the shot apparently did not

19  penetrate his skin. After this, the officers handcuffed Eastman, checked for him for injuries, and

20  found some bleeding from his lower back. After Eastman declined to receive medical attention at

21  the scene, the officer placed him in a patrol car and began investigating the events that led to their

22  altercation with Eastman.

23  **III.   Subsequent Events**

24  Rebecca Gonzalez, Eastman's ex-girlfriend, informed the officers that she and

25  Eastman had been in a relationship for 14 years but that the relationship ended two years ago.

26  Gonzalez stated to police that she and Eastman got into a verbal altercation in the car when they

began discussing personal issues. They had asked their son to wait in Eastman's car so that he did not hear the argument. Gonzalez also told the police that Eastman did not touch her at any point during their heated discussion. Instead, Gonzalez said Eastman was actively gesturing with his hands, as he frequently does. Their son, Marvin III, corroborated his mother's statements. Nonetheless, Officer Miller testifies that as he was talking to Gonzalez he noticed a faint scratch near the center of her neck and some discoloration on the left side of her neck, but both marks faded quickly.

Eastman was subsequently arrested for domestic battery and obstructing a police investigation. The charges were reduced to breach of the peace and subsequently dropped altogether after Eastman attended anger management classes and performed 100 hours of community service. On December 12, 2007, Eastman filed claims in this Court against Officer Miller. He also brings claims against the following Defendants in their supervisory capacity: the City of North Las Vegas, the North Las Vegas Police Department, Police Chief Mark Paresi, Assistant Chief Joseph Forti, Captain Christopher Larotunda, Deputy Chief Edward Finizie, and Sergeant Michael Carmody (collectively, the "Supervising Officers"). Eastman alleges claims against all of these Defendants for (1) violation of 42 U.S.C. § 1983 (Fourth Amendment); (2) battery; (3) intentional infliction of emotional distress; (4) violation of 42 U.S.C. § 1985; (5) and breach of duty. Now that discovery has closed, Defendants move for summary judgment on each of these claims. For the reasons discussed below, the Court grants Defendants' Motion in part and denies it in part.

**DISCUSSION**

**I.    Legal Standard**

A court will grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could

find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In evaluating a motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).

The movant bears the burden of showing that there are no genuine issues of material fact. *Id.* "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the movant satisfies the requirements of Rule 56, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

**II.    Federal Claims**

    **A.    42 U.S.C. § 1983 (Fourth Amendment)**

Eastman brings a § 1983 claim alleging Defendants violated his Fourth Amendment right to be free from unreasonable searches and seizures. Eastman alleges that Officer Miller directly violated his Fourth Amendment rights and that all other Defendants are liable under a theory of supervisory liability. The Court addresses these assertions separately.

        **1.    Officer Miller**

When determining whether the use of force during an arrest is reasonable, courts carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment

1    interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S.
2    386, 396 (1989).  This analysis requires an examination of the following factors set forth in the
3    Supreme Court's ruling in *Graham v. Connor*: (1) the severity of the crime at issue; (2) whether
4    the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the
5    suspect was actively resisting arrest or attempting to evade arrest by flight.  *Id.*  The "most
6    important single element" of this criteria is whether the suspect poses an immediate threat to the
7    safety of the officers or others.  *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

8            In addressing Defendants' Motion for Summary Judgment, the Court notes the
9    Ninth Circuit has held that "[b]ecause [the excessive force] inquiry nearly always requires a jury to
10   sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment
11   . . . in excessive force cases should be granted sparingly."  *Santos v. Gates*, 387 F.3d 846, 853 (9th
12   Cir. 2002); *see also Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) ("We
13   have repeatedly held that the reasonableness of force used is ordinarily a question of fact for the
14   jury.").

15           In light of the evidence presented in this case and the law regarding excessive force
16   claims, the Court denies Defendants' Motion for Summary Judgment on Eastman's § 1983 claim.
17   Even assuming the alleged crime at issue was serious enough to justify Officer Miller's actions,
18   the Court cannot say that Eastman posed a threat to the safety of others or that he was resisting
19   arrest such that Defendants are entitled to summary judgment.  First, although Miller likely had
20   reason to believe Eastman could be dangerous, he has not shown that his actions were reasonable
21   as a matter of law.  Although Defendants allege Eastman disobeyed orders to put his hands in plain
22   view and that he later put his hands back in the car, this does not necessarily mean Miller was
23   justified in using the force he did.  Miller allegedly (1) forced Eastman to put his face on the
24   pavement even though his body was already close the ground, and (2) tased Eastman when he was
25   on the ground and two other police officers were pointing their guns at him.  Given these
26   allegations, the Court believes a reasonable juror could conclude that because Eastman did not

pose a threat to the officers or anyone else at the time Miller used force on him, Miller violated his Fourth Amendment rights.

In addition to disputing the level of danger Eastman posed to others, the parties dispute whether Eastman was actively resisting arrest. Eastman claims he opened the door in order to talk the police, but the officers apparently viewed this as a potential act of aggression. Furthermore, Eastman claims Officer Miller ordered him to the ground as soon as he got out of the car, yet Eastman alleges he stepped out of the car only because Smirga told him to do so. Finally, Eastman alleges that when Miller ordered him to put his face on the ground and tased him in the back, Eastman was not actively resisting arrest, but was trying to avoid injury and comply with the officers' orders. The Court finds that Eastman's testimony creates a genuine issue of material fact regarding whether he was resisting arrest at the time Miller used force to arrest him. Accordingly, the Court denies Defendants' Motion for Summary Judgment on Eastman's Fourth Amendment claim.

**2.      Supervising Officers**

Eastman also brings a § 1983 claim against the Supervising Officers. Eastman alleges these Defendants are liable under § 1983 because they were responsible for the creation and implementation of the department policies that ultimately led to the violation of his Fourth Amendment rights.

The U.S. Supreme Court has held that municipalities are "persons" for purposes of liability under § 1983. *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 690 (1978). Municipalities are liable under § 1983 when their employees or agents act (1) under color of state law; (2) according to a policy or custom of the municipality; (3) amounting to deliberate indifference to the Plaintiff's rights; and (4) resulting from such policy, which was in fact "the moving force behind the constitutional violation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)); *Monell*, 436 U.S. at 694. A plaintiff need not show that the policy or custom "received formal approval through the [municipality's]

1  official decision making channels." *Monell*, 436 U.S. at 690. A municipality can be liable for

2  having a *de facto* policy in place that led to the constitutional violation. *Id.* Nonetheless, a

3  "plaintiff cannot prove the existence of a municipal policy or custom based solely on the

4  occurrence of a single incident or unconstitutional action by a non-policymaking employee."

5  *Nadell v. Las Vegas Metro. Police Dept.*, 268 F.3d 924, 929 (9th Cir. 2001) (citing *Davis v. City of*

6  *Ellensburg*, 869 F.2d 1230, 1233 (9th Cir. 1989)).

7        Eastman alleges the Supervising Officers are liable under § 1983 because they

8  implemented a *de facto* policy "to summarily punish persons in an unlawful manner without

9  corroborating information and without rightful authority of law and by the excessive use of force."

10  (Dkt. #1, Compl. ¶ 70.) Defendants move for summary judgment alleging that Eastman has

11  brought forth no evidence to indicate that the Supervising Officers established or ratified any sort

12  of policy approving such behavior. The Court disagrees. In his deposition, Chief of Police Mark

13  Paresi testified that under his leadership the North Las Vegas Police Department decided to allow

14  their officers to carry and use tasers and implemented a set of policies and procedures regulating

15  their use. (Dkt. 56, Ex. B.) Paresi further testified that after reviewing the police report in this

16  case, he concluded that Officer Miller appropriately followed police department procedure when

17  he chose to tase Eastman. As noted above, a genuine factual dispute exists regarding whether

18  Officer Miller violated the Eastman's Fourth Amendment rights when he used his taser on him.

19  Consequently, if the finder of fact concludes that Miller is liable under § 1983, the Supervising

20  Officers can also be held liable because they approved and implemented the policies governing the

21  use of tasers that led to this incident.

22      **B.**    **42 U.S.C. § 1985**

23        Eastman also alleges Defendants conspired to violate his constitutional rights in

24  violation of 42 U.S.C. § 1985. A plaintiff has a valid § 1985 claim if he can show that the

25  defendants (1) conspired for the purpose depriving the plaintiff of the equal protection of the law;

26  (2) engaged in an act that furthered the object of this conspiracy; and (3) caused the plaintiff to

AO 72
(Rev. 8/82)

suffer the deprivation of this right as a result. *Griffin v. Breckenridge Park*, 403 U.S. 88 (1971). Because this claim arises out of Defendants' alleged efforts to violate Eastman's right to equal protection of the law, a racial or class-based animus must motivate the conspirators' actions. *Id.*

Eastman alleges Defendants conspired to deprive him of his civil rights because racial animus, but he does not provide facts to support this allegation. Even assuming, however, that Eastman has stated a viable § 1985 claim, he has not brought forth any evidence—by way of affidavit, deposition testimony, or otherwise—to suggest that Defendants conspired to violate his civil rights because of this race. Eastman's Opposition, like his Complaint, does nothing more than simply allege that he was the victim of a § 1985 conspiracy. Moreover, as Defendants correctly argue, the facts indicate that Eastman does not have an actionable § 1985 claim. Officer Miller responded to two police dispatches indicating that a man was physically abusing a woman in his car. It is also alleged that neither occupant complied with the officers' initial request that they keep their hands in the officers' view. Thus, while the facts suggest Officer Miller may have used excessive force in arresting Eastman, they also indicate that the officers had reasonable basis for questioning Eastman and for believing he could be dangerous. Because of these facts and because Eastman rests his whole § 1985 claim on a mere allegation of racial animus, the Court concludes Eastman has not carried his burden of showing that a triable issue of fact exists in this case. Accordingly, the Court grant Defendants' Motion for Summary Judgment on this claim.

**III.     State Law Claims**

    **A.     Discretionary Immunity**

In addition to his two federal claims, Eastman brings state law claims against Defendants for battery, intentional infliction of emotional distress, and breach of duty. Defendants allege they cannot be liable under Nevada law because they are protected by discretionary immunity under NRS 41.032. The Court disagrees.

Under NRS 41.032, no action may be brought against an officer or employee of the state "[b]ased upon the . . . performance or the failure to . . . perform a discretionary function . . . ,

whether or not the discretion involved is abused." Notably, a police officer's "decision as to how to accomplish a particular seizure or search is generally considered a discretionary determination under Nevada law, and officers are therefore immune from suit as to state law claims arising therefrom in most cases." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007) (quoting *Ortega v. Reyna*, 953 P.2d 18 (Nev. 1998)). But despite this general rule, state officers and employees are not entitled to discretionary immunity if they act in bad faith. *Falline v. GNLV Corp.*, 823 P.2d 888, 892 n.3 (Nev. 1991). Thus, when a police offer "arrests a citizen in an abusive manner not as the result of the exercise of poor judgment as to the force required to make an arrest, but instead because of hostility toward . . . a racial minority or because of a willful or deliberate disregard for the rights of a particular citizen," the officer is not immune from suit. *Davis*, 478 at 1060 (citing *Falline*, 823 P.2d at 892 n.3).

The Court concludes that Nevada's discretionary immunity statute does not—as a matter of law—shield Defendants' from Eastman's lawsuit. Although Eastman has brought forth no evidence to indicate that the Defendants acted with racial animus against him, a reasonable juror could conclude that Officer Miller nonetheless acted in bad faith by willfully and deliberately disregarding Eastman's Fourth Amendment rights. *See Davis*, 478 F.3d at 1060. In the Court's view, a juror could conclude that Miller acted in bad faith when he forced Eastman to put his face on the pavement and shot him twice in the back with his taser gun. Because this factual issue remains to be resolved, the Court denies Defendants' Motion for Summary Judgment based on discretionary immunity.

### B. Causes of Action

#### 1. Battery

Battery is defined as the unlawful touching of another without justification or excuse. *Ashcroft v. King*, 278 Cal. Rptr. 900, 903 (2nd. Dist. 1991); *see also* NRS 200.400 (criminal battery). Consequently, when a police officer conducts a lawful arrest, he or she cannot be liable for battery. *See Davis*, 478 F.3d at 1059. The Court denies Defendants' Motion for

1  Summary Judgment on Eastman's battery claim because a factual dispute exists regarding whether
2  Officer Miller was justified in using his taser on Eastman.

### 2. Intentional Infliction of Emotional Distress

In order to recover for intentional infliction of emotional distress, a plaintiff must prove that (1) the defendant engaged in extreme and outrageous conduct with the intention of causing emotional distress or with reckless disregard for the plaintiff's emotional distress; (2) the plaintiff suffered severe or extreme emotional distress as a result; and (3) the defendant's actions were the proximate cause of plaintiff's emotional distress. *Jordan v. State*, 110 P.3d 30, 52 (Nev. 2005). This is a high standard. In order for conduct to be extreme and outrageous, it must be "outside all possible bounds of decency and [] regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1988). Nonetheless, law enforcement officers can be liable for this tort if there has been "an extreme abuse of [the officer's] position" of authority. Restatement (Second) of Torts § 46 cmt. e.

For the same reason the Court declines to grant discretionary immunity, it denies Defendants' Motion for Summary Judgment on this claim. Because a factual dispute exists regarding whether Officer Miller's actions constitute an extreme breach of his authority as a police officer, the Court cannot find as a matter of law that Defendants are not liable for intentional infliction of emotional distress.

### 3. Breach of Duty

Eastman brings a claim for breach of duty, alleging that Defendants breached their "duty to protect civilians." (Dkt. #1, Compl. ¶ 96.) In response to Defendants' assertion that breach of duty is not a cognizable claim in Nevada, Eastman alleges this is actually a claim for negligence under NRS 41.0336. This statute states in relevant part: "a . . . law enforcement agency is not liable for the negligent acts . . . of its officers . . . , unless [the] officer affirmatively caused the harm."

/

12

This statute clearly permits citizens to bring negligence claims against police departments when their officers "affirmatively cause harm." This phrase—"affirmatively cause harm"—has been defined by the Nevada Supreme Court as "an act creating a dangerous situation which leads directly to the damaging result." *Coty v. Washoe County*, 839 P.2d 97, 99 (Nev. 1992). As far as the Court can tell, plaintiffs do not normally invoke this statute when asserting claims arising out of wrongful arrests. Nonetheless, the statute does impose a duty on the part of officers not to affirmatively cause harm to individuals. Because a reasonable juror could find that Miller created the dangerous situation that led to Eastman's harm, the Court denies Defendants' Motion for Summary Judgment on this claim.

### IV.     Motion for Hearing

Eastman asks the Court to hold a hearing on Defendants' Motion for Summary Judgment because the many factual disputes in this case would be most effectively addressed at oral argument. The Court is normally inclined to grant such requests. However, it finds that granting Eastman's request serves little purpose because the Court rules in Eastman's favor on all of his claims except his § 1985 claim. Furthermore, the Court dismisses the § 1985 claim because Eastman brought forth no evidence to support his conclusory assertion that the officers acted with racial animus. Since the Court would not permit Eastman to submit new evidence at the hearing, granting his Motion would in no way give him the opportunity to resuscitate his § 1985 claim. Accordingly, the Court denies Eastman's Motion for Hearing.

/
/
/
/
/
/
/

**CONCLUSION**

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (#45) is GRANTED in part and DENIED in part as follows:

Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's claim for violation of 42 U.S.C. § 1985, and DENIED as to all other claims.

IT IS FURTHER ORDERED that Plaintiff's Motion for Hearing (#64) is DENIED.

Dated: February 1, 2010.

_____
**ROGER L. HUNT**
**Chief United States District Judge**